FILED

00 MAY 15 PM 2:00

U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>THE BYRD COMPANIES, INC.,<br>REALTORS,<br><br>  Debtor.<br>_____<br><br>W. WOOD BYRD, JR. and<br>BACADAM OUTDOOR<br>ADVERTISING, INC.,<br><br>  Appellants,<br><br>vs.<br><br>NEW OWNERS, VESTAVIA, L.L.C.,<br>et al.,<br><br>  Appellees. | Bankruptcy Appeal Case No.:<br>CV 00-PT-303-S<br><br>Bankruptcy Court Case No.:<br>98-1643-TBB-11 |

ENTERED
MAY 15

## MEMORANDUM OPINION

This cause comes to be heard on appeal from the United States Bankruptcy Court for the Northern District of Alabama, Southern Division. Currently before the court are Appellants' assertions that the bankruptcy court failed to apply the correct standard in defining "ordinary course of business" under 11 U.S.C. § 364(a), that the bankruptcy court erred in holding that certain unsecured loans were not in the "ordinary course of business" under 11 U.S.C. § 364(a), that the unsecured loans were actually administrative expenses under 11 U.S.C. § 503(b)(1), and that the bankruptcy court erred when it took into consideration certain evidence in forming its

opinion.

## BACKGROUND

The debtor and debtor-in-possession, The Byrd Companies, Inc. Realtors ( "Debtor"), is a real estate development corporation which builds, develops, and manages commercial and residential real estate properties. Appellant W. Wood Byrd, Jr. ("Byrd") is the majority shareholder and president of the Debtor. Byrd is also the sole shareholder and president of appellant Bacadam Outdoor Advertising, Inc. ("Bacadam"). On March 10, 1998 (the "Filing Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, § 101 et seq. (the "Bankruptcy Code").

In April 1998, approximately one month after the Filing Date, Byrd began loaning money to Debtor on an unsecured basis. In total, Byrd claims approximately $1.2 million in post-petition administrative expenses. Debtor never sought approval from the bankruptcy court for these post-petition loans, nor did the bankruptcy court grant approval for the loans sua sponte.

Also after the Filing Date, Bacadam began loaning money to Debtor on an unsecured basis. In total, Bacadam claims $500,000 in post-petition administrative expenses. Byrd signed all the checks written by Bacadam for Debtor. Debtor never sought approval from the bankruptcy court for these post-petition loans, nor did the bankruptcy court grant approval for the loans sua sponte.

The post-petition cash advances made by both Bacadam and Byrd (collectively, the "Post-petition Advances") were all made with personal funds of Byrd or by checks signed by Byrd. Debtor was administratively insolvent at the time the Post-petition Advances were made. Byrd and Bacadam advanced money to Debtor to assist it in covering cash shortfalls caused by

Debtor's operating losses during the course of its bankruptcy case. Debtor used the funds to cover, for example, property operating expenses, repairs, and improvements; subcontractor invoices; and employee wages and insurance. The Post-petition Advances were deposited into Debtor's checking account and commingled with other funds.

On December 1, 1998, Debtor filed its original Plan of Reorganization and accompanying Disclosure Statement with the Bankruptcy Court. Both documents were signed by Byrd as president of Debtor. No mention was made in either document regarding any post-petition money advances. Rather, the disclosure statement stated that "[t]here appear to be no administrative expenses in this case at the time other than attorneys' fees."

On March 5, 1999, Michael Gravois, a minority shareholder and creditor of Debtor ("Gravois"), filed a competing chapter 11 plan or reorganization and accompanying disclosure statement in Debtor's case

On March 26, 1999, Debtor filed its Amended Plan of Reorganization and accompanying Amended Disclosure Statement with the Bankruptcy Court. Both documents were signed by Byrd as president of Debtor. Again, no mention was made in either document regarding any post-petition money advances. Rather, the disclosure statement stated that "[t]here appear to be no administrative expenses in this case at the time other than attorneys' fees."

On May 28, 1999, appellee New Owners, Vestavia, L.L.C. ("New Owners"), filed its chapter 11 plan and accompanying disclosure statement in Debtor's case.

On June 21, 1999, Byrd filed a Verified Application for Payment of Administrative Expenses (the "Byrd Application"), requesting $1,237,026 for post-petition cash advances. Four days later, on June 25, 1999, Bacadam filed a Verified Application for Payment of

Administrative Expenses (the "Bacadam Application") (collectively as the "Applications"), signed by Byrd, requesting $500,362 for post-petition cash advances. Various creditors of Debtor filed written objections to the Applications. The Bankruptcy Court set the Applications and the objections thereto for final hearing on December 1, 1999.

On August 11, 1999, Debtor filed a Third Amended Plan of Reorganization and Third Amended Disclosure Statement, signed by Byrd. In these documents, Byrd and Bacadam agreed that they would waive any claim that they might have against Debtor for the Post-petition Advances if the Bankruptcy Court confirmed Debtor's Third Amended Plan. Bacadam and Byrd did not agree to waive their claims in the event that the Bankruptcy Court confirmed one of the creditors' chapter 11 plans.

At the December 1, 1999 hearing, counsel for Debtor, Salem Resha, made some interesting admissions:

> COURT: Why is your client entitled, or Bacadam, your clients, I should say, entitled to any administrative priority when they disregarded the requirements of 364? These were clearly loans that were not in the ordinary course of business. You concede that, don't you?
> RESHA: Well, it was used to fund the ordinary course of business operations -
> COURT: If [Byrd] made loans to the company, he and Bacadam in excess of a million and a half dollars, and in most months the loans appear to have run somewhere from fifty to a hundred and some odd thousand dollars a month, which given that kind of money, they would have to, would they not?
> RESHA: Yes, sir.
> COURT: And are you going to tell me that those kinds of loans are in the ordinary course of business?
> RESHA: No, sir.
> COURT: So 364 required notice and a hearing and the approval of the court, did they not?
> RESHA: Well, under 364, I understand what you mean, yes.

Trial Transcript ("Tr.") at 80.

4

> COURT: What is the legal standard in the ordinary course of business? It has two prongs to it, right?
> RESHA: Yes.
> COURT: It is in the ordinary course of the debtor's business and it is in the ordinary course of what is done in the industry. It is a horizontal test and a vertical test.
> RESHA: Yes.
> ...
> COURT: Well, do you disagree with that is the standard?
> RESHA: Well, no, sir.

Id. at 89-90.

The Bankruptcy Court recalled some prior proceedings:

> COURT: My point is that really what [Byrd] has done here, and this is not new to your client because I told him some time ago when I discovered a much smaller dollar amount that he had advanced some monies, that he did it at his own peril.

Id. at 77.

> COURT: And on at least two occasions in 1988 [sic], I very pointedly, and one was in the context of the Rite Aid transaction, I very pointedly told Mr. Byrd and counsel for the debtor-in-possession that they [extended unsecured credit] at their own risk.

Id. at 202; see also 204, 205.

> COURT: And it is not likely that I would have approved the unsecured credit that was advanced by Mr. Byrd or by Bacadam on a priority basis.

Id. at 207.

Byrd testified to Debtor's customary methods of obtaining funding:

> RESHA: Well, what was the customary way of financing the construction of the houses in Crossbridge?
> BYRD: Get a home development loan from a lender and hire out subcontractors to construct the project and make weekly, I think either weekly or biweekly draws on the line.
> RESHA: And that is the way it was set up up until the point the bankruptcy was filed?

5

> BYRD: Absolutely.
> RESHA: And then because of bankruptcy, you had to make other arrangements?
> BYRD: That is it.
> RESHA: And what were the arrangements that were made?
> BYRD: Well, I or Bacadam or Scales, you know, through - I was fortunate enough to have some money to lend to the company so that the projects could be completed and increase the values of them.
> ...
> RESHA: [responding to the COURT] But Your Honor, it was in the ordinary course that he had to have a loan and to finance - it was unusual that he had to replace the bank.

Id. at 112-114. Byrd also testified that he knew of 11 U.S.C. § 364 and its attendant requirements:

> Q: Mr. Byrd, did you know that in order to obtain some kind of priority that you could have filed a motion with the court seeking advance approval of these contributions?
> ...
> A: At some point I was made aware of that by the Judge.

Id. at 154.

> Q: Mr. Byrd, did you contact any attorneys and ask them whether you needed court approval before making these loans?
> A: I talked to the attorneys that were handling this Chapter 11.
> Q: But the debtor never sought approval, never filed an application to get authority to obtain these funds, did it?
> A: Well, what I was told, and I still believe, regardless of what anybody says, and I read the code myself. ...
> Q: So you personally reviewed section 364 yourself early in the case?
> A: Well, he showed it to me.
> Q: Yet you still did not seek approval?
> A: Well, I think (a) says I don't have to.

Id. at 173.

The Bankruptcy Court ultimately held that the cash advances made by Byrd and Bacadam were not in the ordinary course of the Debtor's business; that Byrd and Bacadam did not obtain

6

court approval for the unsecured loans; that the Debtor had blatantly ignored the mandates of the bankruptcy system and the Bankruptcy Code; and that there was no reason to equitably allow Byrd and Bacadam administrative priority for their claims.

On December 15, 1999, the Bankruptcy Court entered an order denying administrative status to all post-petition cash advances made by Byrd and Bacadam to Debtor. Debtor appeals from that order.

## DISCUSSION

### I. Standard of Review

A bankruptcy court's legal conclusions are subject to de novo review by a district court. See In re Calvert, 907 F.2d 1069, 1071 (11th Cir. 1990); FED. R. BANKR. P. 8013. A bankruptcy court's findings of fact should not be set aside unless they are clearly erroneous. FED. R. BANKR. P. 8013; see also In re A.W. & Assoc., 136 F.3d 1439, 1441 (11th Cir. 1998). Bankruptcy court determinations of whether transactions are within the "ordinary course of business" under 11 U.S.C. § 364 involve questions of both law and fact. See In re Garafalo's Finer Foods, Inc., 186 B.R. 414, 421 (N.D. Ill. 1995). Determinations regarding what test to use to determine whether transactions are within the "ordinary course of business" are legal questions, and are subject to de novo review. Id. Determinations of fact regarding transactions at issue should not be set aside unless clearly erroneous. Id.

### II. "Ordinary Course of Business"

#### A. Administrative Expense Priority

Byrd and Bacadam argue that the bankruptcy court used the wrong standard in determining whether the transactions at issue were in the ordinary course of business under 11

7

U.S.C. § 364(a). Rather than using the vertical test alone (discussed below), Appellants argue, the bankruptcy court erred in going on to consider the horizontal test as well, relying primarily on In re Garofalo's Finer Foods, Inc., 186 B.R. 414 (N.D. Ill. 1995).[1] However, even assuming both tests apply, Appellants contend, the unsecured loans still qualified as administrative expenses under 11 U.S.C. § 503(b)(1)(A), and prior court approval was unnecessary. Appellees disagree, arguing that both the horizontal and vertical tests apply. However, even assuming that only the vertical test applies, Appellees assert, the transactions at issue still fail to fall within the realm of the "ordinary course of business."

"The fundamental purpose of Chapter XI is the rehabilitation of the debtor's business." In re Mammoth Mart, Inc., 536 F.2d 950, 953 (1st Cir. 1976). A debtor may, as a "debtor-in-possession," continue to operate the business under the supervision of the bankruptcy court. See 11 U.S.C. §§ 1107, 1108. Congress designed 11 U.S.C. § 364(a) to facilitate the rehabilitation of insolvent businesses, realizing that creditors would rarely, if ever, deal with a business in chapter 11 proceedings without statutory assurances that they would be put "in the front of the line" when it came time to collect. See Mammoth Mart, 536 F.2d at 954.

11 U.S.C. § 364(a) provides that a chapter 11 debtor "may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense." Section 503(b)(1) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses, ... including (A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services

---

[1] At the hearing, counsel for Appellants explicitly agreed with the bankruptcy court that the two part test applied. Tr. at 89-90.

8

rendered after the commencement of the case...." Section 364(b) provides that "[t]he court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense." Courts have commonly held that where an administrative expense is within the ordinary course of business, no notice or hearing is required, but where an administrative expense falls outside of the ordinary course of a business, notice and a hearing is required.[2] See 3 KING, COLLIER ON BANKRUPTCY ¶ 364.02 (15th ed. 1979).

Appellants do not dispute that they bear the burden of proving that their administrative expense claims were due to be allowed. See, e.g., In re Fulwood Enterprises, 149 B.R. 712, 715 (Bankr. M.D. Fla. 1993); In re Highland Group, Inc., 136 B.R. 475, 481 (Bankr. N.D. Ohio 1992) (citing Woods v. City Nat'l Bank & Trust Co., 312 U.S. 262, 268 (1941)); In re Massetti, 95 B.R. 360, 363 (Bankr. E.D. Penn. 1989); see also 11 U.S.C. § 503. As "insiders," their burden is high. See 11 U.S.C. §§ 101(2)(B), 101(31)(B)(ii), 101(31)(B)(iii), 101(31)(E); In re Fett Roofing & Sheet Metal Co., Inc., 438 F. Supp. 726, 729 (E.D. Va. 1977), aff'd, 605 F.2d 1201 (4th Cir. 1979) ("A director, officer, majority shareholder, relatives thereof or any other person in a fiduciary relation with a corporation can lawfully make a secured loan to the corporate beneficiary. However, when challenged in court a fiduciary's transaction with the corporation will be subjected to 'rigorous scrutiny' and the burden will be on him '... not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint

---

[2] The court notes the odd distinction here, either ignored or unnoticed by other courts. 11 U.S.C. § 503(b)(1) requires notice and a hearing. As § 364(a) requires compliance with § 503(b)(1), it would presumably require notice and a hearing also. However, this makes the mandate for notice and a hearing in § 364(b) redundant via its mention of § 503(b)(1).

of the corporation and those interested therein.'") (quoting Pepper v. Litton, 308 U.S. 295 (1939)).

Much litigation has surrounded the term "ordinary course of business." Though the term is used multiple times within the Bankruptcy Code, see 11 U.S.C. §§ 363, 364, 547, Congress left it undefined. Courts have strived to construct a workable test to determine which unsecured loans for administrative expenses fall within the realm of the "ordinary course of business." In this process, two tests have emerged: the vertical and horizontal dimensions test, and the reasonable expectations test (which is simply the vertical dimension test alone). The Eleventh Circuit has not yet adopted one test or the other in this context.[3]

### 1. The Vertical Dimension or Reasonable Expectations Test

The vertical dimension test is used by courts to determine whether a transaction is within the ordinary course of day-to-day business for a particular debtor. See In re James A. Phillips, Inc., 29 B.R. 391, 394 (S.D.N.Y. 1983); Waterfront, 56 B.R. at 35; Dant & Russell, 853 F.2d at 705.

> Courts, in utilizing the vertical dimension, have logically looked first at the debtor's prepetition business practices and conduct....
>
> The primary focus of the vertical dimension is thus on the debtor's internal operation and workings. The "ordinariness" of actions taken by a debtor depends upon the nature, type and size of its business.

---

[3] But see In re A.W. & Associates, Inc., 136 F.3d 1439 (11th Cir. 1998) (under 11 U.S.C. § 547(c)(2), industry standards, or the horizontal dimension, should be considered as one factor when determining whether a transfer was in the ordinary course of business); In re Craig Oil Co., 785 F.2d 1563 (11th Cir. 1986) (same). However, in the context of § 547(c)(2), explicit mention is made to ordinary business terms, indicating a legislative intent that the practices of similar businesses be considered. This type of language is absent within §§ 364 and 503.

10

In re Johns-Manville Corp., 60 B.R.612, 617 (Bankr. S.D.N.Y. 1986). See also In re C.E.N., Inc., 86 B.R. 303 (Bankr. D. Maine 1988). "[A] fundamental characteristic of an 'ordinary' post-petition business transaction is its similarity to a pre-petition business practice." In re Garofalo's Finer Foods, Inc., 186 B.R. 414, 425 (N.D. Ill. 1995). "[A] post-petition transaction undertaken by the debtor that it did not undertake pre-petition may be considered an extraordinary transaction since a creditor would not reasonably expect its occurrence." Id. at 426. It is also called the "reasonable expectations test":

> The touchstone of "ordinariness" is ... the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business. So long as the transactions conducted are consistent with these expectations, creditors have no right to notice and hearing, because their objections are likely to relate to the bankrupt's chapter 11 status, not the particular transaction themselves.

James A. Phillips, 29 B.R. at 394. Similarly, 11 U.S.C. § 547(c)(2) prevents a debtor from avoiding preferential transfers made in the ordinary course of business. See Craig Oil Co. v. Flatau, 785 F.2d 1563, 1567 (11th Cir. 1986) (scope of protection under § 547(c)(2) limited to trade credit needed to keep debtor "current").

In considering whether both dimensions should be utilized by courts in determining whether a transaction occurred within the ordinary course of business under § 364(a), the court in Garofalo concluded that only the vertical dimension test should be employed. 186 B.R. at 428. The Garofalo court reasoned that, first, § 547(c)(2)(C) explicitly concerns an objective component, i.e. a comparison to industry-wide standards.[4] Second, § 364(a) does not consider

---

[4] 11 U.S.C. § 547(c)(2) states:
The trustee may not avoid under this section a transfer to the extent that such transfer was (A) in payment of a debt incurred by the debtor in the ordinary course

11

objective industry-wide standards, but rather considers subjective standards, i.e. what is typically within the normal running of the debtor's business pre-petition. Comparing these two aspects of the Bankruptcy Code, and considering that Congress could have inserted similar language into both sections, the court concluded that Congress did not intend to include an objective industry-wide test when considering the ordinary course of business of a debtor under § 364(a). The Garofalo court further opined that the horizontal dimension test is redundant and a "problem plagued endeavor." Id. at 429-30. Other courts have applied the vertical test exclusive of the horizontal test, but without discussion as to the basis for their decision. See In re Cascade Oil Co., Inc., 51 B.R. 877 (Bankr. D. Kansas 1985); James Phillips, 29 B.R. 391.

### 2. The Horizontal Dimension or Industry-Wide Test

The seminal case for the horizontal dimension test is In re Waterfront Companies, Inc., 56 B.R. 31 (Bankr. D. Minn. 1985). In utilizing the horizontal dimension test, a court compares the debtor's business to other similar businesses. Through this comparison, the court determines "whether a type of transaction is in the course of that debtor's business or in the course of some other business." Id. at 35. That is to say, the court determines whether the transaction at issue is common within industry-wide standards. See In re Dant & Russell, Inc., 853 F.2d 700, 704 (9th Cir. 1988).

### 3. Analysis

This court agrees with the Garofalo court. The Eleventh Circuit has explicitly held that it

---

of business or financial affairs of the debtor and the transferee; (b) made in the
ordinary course of business or financial affairs of the debtor and the transferee;
and (C) made according to ordinary business terms....
(emphasis added).

12

is the language in § 547(c)(2)(C) which gives rise to the application of an industry-wide test in determining whether a transaction is within the ordinary course of a business. A.W. & Assoc., 136 F.3d at 1442-43. Congress could have included the language of § 547(c)(2)(C) in § 364. It did not. From this, it can be inferred that congress did not intend for courts to consider industry-side standards when considering what transactions fall within the ordinary course of a business under the specific circumstances of § 364. Rather, a court is to consider what is within the ordinary course of the business for itself and its creditors, without considering what is common throughout the industry in which the debtor is involved. However, as stated above, the Eleventh Circuit has not decided the issue. While the bankruptcy judge arguably erred with regard to the standard to be applied in determining whether an administrative expense falls within § 364(a), the effect on his decision was harmless.

According to the foregoing, the court will now apply the vertical dimension or reasonable expectation test to the facts as found by the bankruptcy judge, unless those found facts are clearly erroneous. What is at issue here is not whether the funds were used in the ordinary course of business, but whether the extension of credit by Appellants was within the ordinary course of business. See In re Massetti, 95 B.R. 360, 363 (Bankr. E.D. Penn. 1989); Dant, 853 F.2d 700; Johnson-Manville, 60 B.R. 612; In re Lite Coal Mining Co., 122 B.R. 692 (Bankr. N.D. Virg. 1990). In this case, Byrd testified that he occasionally lent money to Debtor on an unsecured basis pre-petition.

> Q: Had there been a history of loans from yourself or other principals of the company in the four or five years preceding the bankruptcy?
> A: Yes.

Tr. at 108-109. However, later Byrd testified to the following:

> RESHA: Well, what was the customary way of financing the construction of the houses in Crossbridge?
> BYRD: Get a home development loan from a lender and hire out subcontractors to construct the project and make weekly, I think either weekly or biweekly draws on the line.
> RESHA: And that is the way it was set up up until the point the bankruptcy was filed?
> BYRD: Absolutely.
> RESHA: And then because of bankruptcy, you had to make other arrangements?
> BYRD: That is it.
> RESHA: And what were the arrangements that were made?
> BYRD: Well, I or Bacadam or Scales, you know, through - I was fortunate enough to have some money to lend to the company so that the projects could be completed and increase the values of them.

Id. at 112-114. Mr. Resha, counsel for Appellants, admitted to the following:

> COURT: Why is your client entitled, or Bacadam, your clients, I should say, entitled to any administrative priority when they disregarded the requirements of 364? These were clearly loans that were not in the ordinary course of business. You concede that, don't you?
> RESHA: Well, it was used to fund the ordinary course of business operations -
> COURT: If [Byrd] made loans to the company, he and Bacadam in excess of a million and a half dollars, and in most months the loans appear to have run somewhere from fifty to a hundred and some odd thousand dollars a month, which given that kind of money, they would have to, would they not?
> RESHA: Yes, sir.
> COURT: And are you going to tell me that those kinds of loans are in the ordinary course of business?
> RESHA: No, sir.
> COURT: So 364 required notice and a hearing and the approval of the court, did they not?
> RESHA: Well, under 364, I understand what you mean, yes.

Tr. at 80. The bankruptcy court made this factual finding:

> What I have is evidence that is not solely from this hearing but from other hearings that I have had in this case and it is clear to me that the debtor, pre-bankruptcy and post-bankruptcy, has for capital, not operating expense purposes, but for capital expenditures obtained credit on a secured basis, not an unsecured basis.

> I don't have any evidence that the debtor obtained routinely and repetitively every month, which is what has occurred post-bankruptcy, every month post-bankruptcy until maybe sometime late in this year there had been advances made of significant amounts of money by Mr. Byrd and/or Bacadam or Scales of significant amounts of money. And there is simply no evidence that shows that those advances historically would be considered to be in the ordinary course of business of the debtor. And so, for that reason additionally, I am going to hold that they were not made in the ordinary course of the debtor's business.
> Additionally, I don't have any evidence with respect to Bacadam whatsoever on what was in its ordinary course of business and dealings with the debtor...

Tr. at 136-37.

Based on the evidence contained in the appeal file, it is plain to this court that the bankruptcy court's finding that the transactions at issue were outside the ordinary course of business was not clearly erroneous.[5] Furthermore, under § 503 (b)(1)(A), the transactions must have been actual and necessary costs for preserving the estate. See 3 KING, COLLIER ON BANKRUPTCY ¶ 364.02[2] (15th ed. 1979). Appellants failed to put on any credible evidence that Appellant's loans increased the value of the property. While Byrd testified that he thought some of Debtor's property increased in value due to the cash infusions, no supporting evidence was entered on this issue. Moreover, the bankruptcy judge found that Byrd failed to qualify as any sort of expert or knowledgeable person sufficiently competent to testify authoritatively to such matters.

### B. Evidence At Trial

Byrd and Bacadam contend that the bankruptcy court exceeded its authority when it took judicial notice of the Debtor's operating reports, and relied on those reports in impeaching the

---

[5] Even if the court were to apply both the horizontal and vertical dimensions, Appellants' arguments would still fail.

testimony of Byrd. Appellants assert that the reports had not be properly introduced into evidence, and that the bankruptcy court did not adequately identify which parts of the operating reports it was referring to. Appellants rely on In re American Freight System, Inc., 187 B.R. 692, 696 (D. Kan. 1995), which holds that a trial court's factual findings are clearly erroneous when they directly contradict the only testimony presented. Appellees argue that the Debtor's operating reports actually were a part of the record, that the bankruptcy court took judicial notice of the reports, and that Appellees failed to object at the time, thereby waiving their right to appeal the issue.

At the hearing, counsel for Gravois asked the Bankruptcy court to take judicial notice of the operating reports. Tr. at 176-77. Appellants did not object to this request. Id. While the bankruptcy court did not explicitly grant Gravois's request, it did overtly rely on the reports. Earlier in the proceedings, when the bankruptcy judge stated that he had looked at the operating reports, Mr. Resha failed to object. Tr. at 76-77.

"A court may ... take judicial notice of its own records...." 651 F.2d 343, 345 n.2 (5th Cir. Unit B 1981);[6] FED.R.EVID. Rule 201. It is undisputed that the operating reports submitted by the Debtor to the bankruptcy court as a necessary and required part of its chapter 11 proceedings are a part of the court's records. However, this court need not decide this issue on this point as Appellants failed to object to the bankruptcy court's overt reliance upon the operating reports. "Generally, a party must object to preserve error in the admission of

---

[6] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down on or before September 30, 1981.

16

testimony...." Frederick v. Kirby Tankships, Inc., 205 F.3d 1277, 1285 (11th Cir. 2000) (citing Collins v. Wayne Corp., 621 F.2d 777, 785 (5th Cir. 1980)). Because Appellants completely failed to object to the bankruptcy court's obvious reliance upon the operating reports, they cannot raise the matter for the first time on appeal.[7]

### C. Nunc Pro Tunc

Nunc pro tunc relief may be granted in certain circumstances to a debtor who failed to give proper notice under § 364(b) to the bankruptcy judge. The Second Circuit Court of Appeals, in In re American Cooler Co., Inc., 125 F.2d 496 (2d Cir. 1942), made this oft quoted remark while considering this type of equitable relief:

> We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if a timely application had been made, and unless, in addition, he is reasonably persuaded that the creditors have not been harmed by a continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction. Of necessity, each case must stand on its own facts, and these criteria cannot be mechanically applied; they should, however, materially facilitate the preparation of an intelligent record. We should emphasize that this equitable power must be cautiously exercised, and that only a foolhardy lender will attempt to make it serve as a substitute for proper authorization.

Id. at 497. Relying on American Cooler, some courts have acknowledged that "to ratify unauthorized borrowings or out of the ordinary course of business transactions, except under exceptional circumstances ... would create a dangerous precedent which may likely product pernicious results, hostile and inimical to any legitimate and recognized goals and rehabilitative

---

[7] Furthermore, Appellants reliance on American Freight is misplaced as there arguably was evidence in the record which contradicted Mr. Byrd's testimony, as explained by the bankruptcy judge during the hearing. Tr. at 76-77.

aims of the Bankruptcy Code." In re Alafia Land Development Corp., 40 B.R. 1, 6 (Bankr. M.D. Fla. 1984) (internal citations omitted); see also In re E-Tron Corp., 141 B.R. 49, 56-59 (Bankr. D.N.J. 1992).

Considering these principles surrounding equitable relief, it is this court conclusion that nunc pro tunc relief is wholly inapplicable in this situation. Appellants, via Byrd, knew of § 364(a) and § 364(b), consulted with his attorneys on the issue, and still declined to seek leave from the court. Byrd further knew, and indeed was intimately associated with, the fact that Debtor was in bankruptcy proceedings. Yet despite this knowledge, Appellants chose to extend unsecured credit to Debtor. Furthermore, Debtor, through Byrd, declined to mention these monies as administrative expenses until the last minute. The bankruptcy court stated in the hearing that "it is not likely that I would have approved the unsecured credit that was advanced by Mr. Byrd or by Bacadam on a priority basis." Tr. at 207. For all these reasons, equitable relief is due to be denied.

### III. Conclusion

Based on the foregoing, the Bankruptcy Court will be affirmed.

This 15th day of May, 2000.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**